**Opinion issued July 12, 2012**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-11-00137-CV

_____

## L.M. AND Y.Y., Appellants

## V.

## DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee

---

**On Appeal from the 506th District Court**
**Grimes County, Texas**
**Trial Court Case No. 31627**

---

## MEMORANDUM OPINION

Following a jury trial, the trial court signed a judgment terminating the parental rights of L.M. and Y.Y. to their three minor children, I.M., L.M., Jr., and

T.M.[1]   Identifying five issues, L.M. and Y.Y. challenge the judgment. They contend (1) the trial court abused its discretion by admitting certain evidence at trial, (2) the evidence is legally and factually insufficient to support the judgment, and (3) they received ineffective assistance of counsel at trial.

We affirm.

### Background Summary

On September 18, 2009, Y.Y., accompanied by her husband, L.M., went to the orthopedic clinic in Brenham, Texas for treatment of Y.Y.'s injured arm. X-rays revealed that Y.Y.'s arm was broken. Y.Y. told the physician's assistant that L.M. had broken her arm two weeks earlier. She stated that the injury occurred when L.M. was hitting her, and she raised her arm to deflect L.M.'s blows. Y.Y. stated that L.M. had prevented her from seeking treatment for the broken arm for two weeks. Y.Y. also told the physician's assistant that L.M. had been abusing her for five years. The physician's assistant called the police.

When a police officer arrived, Y.Y. told him that L.M. had broken her arm. She also stated that L.M. had sexually assaulted her the previous night. The officer took Y.Y. to the hospital where a sexual assault examination was performed. Y.Y.

---

[1]   To protect the privacy of the parties involved in this appeal, we identify the children and appellants by initials only. *See* Tex. FAM. CODE ANN. § 109.002(d) (Vernon Supp. 2011).

told medical personnel at the hospital that L.M. had sexually assaulted her and had been abusing her for five years.

After the examination, Y.Y. was taken to the Brenham police station and spoke with an investigator, Sergeant D. Gaskamp. Y.Y. told him that L.M. had sexually assaulted her. She stated that the assault had occurred in Brenham at the home of L.M.'s mother. Y.Y. also told the officer that the sexual assault had occurred in front of their two minor children, I.M. and L.M., Jr. At the time, I.M. was three years old and L.M., Jr. was 10 months old. Sergeant Gaskamp assisted Y.Y. in obtaining a protective order against L.M. in Washington County where the assaults occurred. Y.Y. also obtained a protective order against L.M. in Grimes County, where the couple resided.

Y.Y. then met with the victim services coordinator for the Brenham Police Department. The coordinator assisted Y.Y. in filling out a crime victim's compensation application. In the application, Y.Y. detailed the recent and past incidences of abuse by L.M., including information that L.M. had broken her nose in 2007 when the couple lived in California.

Because of the allegations of domestic violence, the Department of Family and Protective Services ("the Department") was notified. A caseworker with the Department, Juanita Smith, contacted L.M. about Y.Y.'s domestic abuse allegations. L.M. denied the allegations stating that Y.Y. was lying.

3

Smith also spoke with Y.Y. She confirmed that L.M. had broken her arm and sexually assaulted her. Y.Y. also stated that L.M. had assaulted her when they lived in California. Y.Y. said that, in the past, L.M. would abuse her then apologize. After a couple of months, the abuse would resume.

Smith told Y.Y. that the Department was concerned about Y.Y.'s and L.M.'s two children. Smith explained to Y.Y. that it was unlikely that she could protect the children from abuse if she could not protect herself. Smith further explained that witnessing domestic violence is also detrimental to the children's emotional well being. Smith advised Y.Y. not to return to the relationship with L.M.

Smith provided Y.Y. with information regarding a domestic violence shelter and how to obtain financial assistance for her children. Y.Y. said that she and the children were staying with her sister. Y.Y. assured Smith that she would not return to L.M. or permit the children to be with him. She also told Smith that she planned to divorce L.M. Based on these representations by Y.Y., Smith's concerns were alleviated.

L.M. was arrested for assaulting Y.Y. and placed in jail. Sergeant Gaskamp appeared before the grand jury regarding the sexual assault allegations against L.M. Y.Y. did not appear before the grand jury.

L.M. was released from jail on November 20, 2009. Thereafter, the Department learned of L.M.'s release and that Y.Y. had reconciled with him.

4

After learning this information, the Department sought and obtained temporary sole managing conservatorship of Y.Y.'s children, I.M. and L.M., Jr. The Department placed the children in foster care.

In January 2010, the Washington County district attorney's office filed a motion to dismiss the criminal assault case against L.M. on the ground that Y.Y. had requested the dismissal. The court in which the criminal action was pending granted the motion.

Also in January 2010, the Department devised a family service plan for L.M. and Y.Y. The trial court signed an order approving the plan. When the service plan was developed, the Department's goal was family reunification; that is, to reunite Y.Y. and L.M. with their two children. Included in the service plan was a requirement that L.M. attend a program for the perpetrators of domestic violence. L.M. refused to participate in the program because it required him to admit to the abuse allegations, which he denied.

By March 2010, Y.Y. openly admitted to the Department that she had resumed her relationship with L.M. At that point, Y.Y. denied her earlier allegations that L.M. had broken her arm and sexually assaulted her. Y.Y. claimed that she had lied about the abuse.

In April 2010, the Department changed its goal from solely family reunification to a goal of adoption of the two children by a non-relative, concurrent

with the goal of family reunification. The Department cited several reasons for the change: (1) the past domestic abuse; (2) the couple's reconciliation; (3) Y.Y.'s change in her story regarding the reported domestic violence; and (4) L.M.'s failure to participate in the batterer intervention prevention program. The Department was concerned that the cycle of domestic violence would continue between Y.Y. and L.M. and that Y.Y. could not be protective of the children.

In its petition seeking to terminate the parent-child relationship, the Department alleged that Y.Y. and L.M. "had committed one or more . . . acts or omissions" as defined by Family Code section 161.001(1) to support termination of the parent-child relationship between each parent and I.M. and L.M., Jr. The Department sought termination of Y.Y.'s and L.M.'s parental rights under paragraphs D and E of section 161.001(1), both of which describe acts of endangerment.[2] Specifically, the Department alleged that Y.Y. and L.M. had "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children" and had "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children."[3] The Department also alleged that Y.Y. and L.M. had failed to comply

---

[2]     TEX. FAM. CODE ANN. § 161.001(1)(D), (E) (Vernon Supp. 2011).

[3]     *See id.*

6

with provisions of a court order—the family service plan—which specifically established the actions necessary for the parent to obtain the return of the children, in violation of subsection 161.001(1)(O).[4]

In October 2010, Y.Y. gave birth to a third child, T.M. Alleging the same grounds as it had in the suit involving I.M. and L.M., Jr., the Department filed a new suit seeking to terminate Y.Y.'s and L.M.'s parental rights to T.M.

The two suits were tried together to a jury in December 2010. The Department presented the testimony of medical personnel, police officers, case workers, and counselors who had spoken with Y.Y. regarding her report that L.M. had broken her arm and sexually assaulted her. When asked, each witness testified that Y.Y.'s report had appeared credible. A number of the witnesses testified that Y.Y. had reported that L.M. had been abusing her for a number of years. Several of the witnesses also stated that Y.Y. had reported that L.M. had broken her nose when the couple lived in California, resulting in the involvement of law enforcement there.

The Department also introduced documentary evidence describing L.M.'s recent and past abuse of Y.Y. This included photographs of Y.Y. taken at the Brenham Police station when she reported the assaults. The Department introduced the photographs through Sergeant Gaskamp. In the photographs, Y.Y.

---

[4]    *See* TEX. FAM. CODE ANN. § 161.001(1)(O).

is seen with bruises on her body, which Sergeant Gaskamp testified were consistent with the assaults described by Y.Y.

Y.Y. and L.M. testified at trial. L.M. testified that he had not broken Y.Y.'s arm or sexually assaulted her. Y.Y. stated that she had lied when she made the report. She testified that she had made the false accusations because she was upset with L.M. and thought that he was seeing another woman.

Y.Y. explained her broken arm by testifying that it occurred when she hit L.M. from behind, and he turned around to defend himself. She stated, when L.M. had turned around, he had raised his arm in defense. She had hit his arm with her arm causing the bone in her arm to break. Y.Y. testified that the bruises on her body seen in the photographs had been caused by the cast she had worn on her broken arm. She stated that the scratches on her face, seen in the photographs, had been caused by L.M., Jr.

Incorporating the jury's findings, the trial court rendered judgment terminating the parent-child relationships (1) between Y.Y. and her three children, I.M., L.M., Jr., and T.M. and (2) between the children and L.M. The judgment recites that the trial court found, by clear and convincing evidence, that Y.Y. and L.M. had engaged in conduct as defined in Family Code subsections 161.001(1)(D), (E), and (O). In this regard, the judgment provides that each parent had

knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children [TEX. FAM. CODE ANN. § 161.001(1)(D)];

engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children [TEX. FAM. CODE ANN. § 161.001(1)(E)];

failed to comply with the provisions of a court order that specifically established the actions necessary for the [parent] to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children [TEX. FAM. CODE ANN. § 161.001(1)(O)].

The judgment further recites that the trial court determined by clear and convincing evidence that termination of the parent-child relationships was in the children's best interest. The trial court also appointed the Department as sole managing conservator of the children.

### Evidentiary Rulings

In their first three issues, Y.Y. and L.M. (hereinafter collectively referred to as "Appellants") challenge evidentiary rulings allowing the admission of evidence offered by the Department.

### A. Standard of Review

We review the admission of evidence for an abuse of discretion. *See In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). The test for abuse of discretion is

9

whether the trial court acted without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

## B.    Analysis

### 1.    *Caseworker Report and Affidavit*

In their first issue, Appellants contend that the trial court abused its discretion by admitting the investigative report and supporting affidavit of Juanita Smith, the Department caseworker who conducted the initial investigation following Y.Y.'s report of domestic abuse. The report and affidavit were filed with the trial court and offered to support the initial emergency removal of the children from their parents' custody.

At trial, Appellants asserted hearsay objections to the admission of the report and the affidavit. With respect to the affidavit, Appellants did not dispute that the document fell within the business records exception to the hearsay rule. *See* Tex. R. Evid. 803(6). Instead, Y.Y.'s attorney initially objected, "There's hearsay contained, hearsay statements within the affidavit itself." Y.Y.'s attorney thereafter stated as follows:

> My objection to the [] business record, it's not the document itself. I understand it is a business record; however, does not make hearsay statements contained within that hearsay admissible because they're still hearsay statements. Even though the document itself may be admissible, the statements contained in them are not necessarily admissible.

10

L.M. joined the objection. With respect to the report, Y.Y. asserted only that it is a "hearsay document" and L.M. stated, "I object to the hearsay."

"A blanket hearsay objection that does not identify which parts of a document contain hearsay is not sufficiently specific to preserve error with respect to those parts." *In re M.N.*, No. 11–10–00129–CV, 2011 WL 917837, at *1 (Tex. App.—Eastland Mar. 17, 2011, no pet.) (mem. op.) (citing *Flores v. City of Liberty*, 318 S.W.3d 551, 560 (Tex. App.—Beaumont 2010, no pet.); *see In re Estate of Ward*, No. 10–11–00003–CV, 2011 WL 3720829, at *3 (Tex. App.—Waco Aug. 24, 2011, pet. denied) (mem. op.). At trial, Appellants did not specifically identify the statements in the affidavit that they claim were impermissible hearsay. Thus, Appellants did not preserve their complaint that the affidavit or the report contained hearsay statements. *See M.N.*, 2011 WL 917837, at *1.

Moreover, to the extent that error was preserved, a general objection to evidence as a whole, which does not point out specifically the objectionable portion, is properly overruled if any part of that evidence is admissible. *See Speier v. Webster Coll.*, 616 S.W.2d 617, 619 (Tex. 1981); *Lawrence v. Geico Gen. Ins. Co.*, No. 01–07–00873–CV, 2009 WL 1886177, at *5 (Tex. App.—Houston [1st Dist.] July 2, 2009, no pet.) (mem. op.). Appellants do not contend that the

affidavit or the report, as a whole, was inadmissible. Appellants agree that the affidavit falls within the business records exception to the hearsay rule.

Assuming that the documents contain some hearsay statements, a review of the affidavit and the report shows that each also contains non-hearsay statements by Smith. These statements include background information about the Department's involvement in the case, Smith actions to investigate the abuse allegations, and her personal observations. Because portions of the affidavit and the report were admissible non-hearsay evidence, and Appellants did not specifically point out the alleged hearsay statements within the documents, the trial court did not abuse its discretion by overruling Appellants' objection. *See Speier*, 616 S.W.2d at 619; *Lawrence*, 2009 WL 1886177, at *5.

We overrule Appellants' first issue.

2.     *California Police Report*

In their second issue, Appellants contend that the trial court erred by admitting a police report from California involving the report of domestic violence made by Y.Y. against L.M. to Irvine, California police in 2007. The report contains a narrative section written by the investigating police officer dispatched to speak with Y.Y. In that section, the investigating officer states that Y.Y. told him that L.M. had hit her in the face with his fist and choked her when she refused to give him her paycheck. Y.Y. also told the officer that L.M. had hit her before

12

causing black eyes and bruises. The report also describes the officer's arrest of L.M., who denied hitting Y.Y. The report indicates that the officer assisted Y.Y. in obtaining an emergency protective order against L.M.

The report includes a statement by Y.Y.'s co-worker. The co-worker told police that Y.Y. had arrived at work upset, stating that L.M. had hit her. The co-worker had encouraged Y.Y. to call the police.

Appellants objected to the admission of the police report on the grounds that it contained hearsay statements and improper conclusions drawn by the authoring police officer. The Department asserted that the report was admissible under the public records and business records exceptions to the hearsay rule. *See* TEX. R. EVID. 803(6), (8).

With regard to the public records exception, Rule 803(8) reads as follows:

**Public Records and Reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies setting forth:

(A) the activities of the office or agency;

(B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding in criminal cases matters observed by police officers and other law enforcement personnel; or

(C) in civil cases as to any party and in criminal cases as against the state, factual findings resulting from an investigation made pursuant to authority granted by law;

unless the sources of information or other circumstances indicate lack of trustworthiness.

13

TEX. R. EVID. 803(8)(B).

Appellants contend that the report did not qualify as a public record exception. We disagree.

The report described the activities of the police department, involved matters observed pursuant to a duty imposed by law as to which there was a duty to report, and contained factual findings resulting from an investigation made pursuant to authority granted by law. *See id.* The exclusion of matters observed by police officers and other law enforcement personnel, as found in subpart (B), applies only to criminal proceedings; thus, the exclusion does not apply here. *See id.*; *Corrales v. Dep't of Family & Protective Servs.*, 155 S.W.3d 478, 486 (Tex. App.—El Paso 2004, no pet.). In sum, the police report was admissible as a public record. *See Corrales*, 155 S.W.3d at 486.

On appeal, Appellants assert that the report was inadmissible because it contains "statements made by people other than the speakers." The report does contain the statement of Y.Y.'s co-worker, which does not qualify as a public record. *See Sherbin v. Dean Word Co.*, No. 03–09–00053–CV, 2010 WL 2698761, *5 (Tex. App.—Austin July 9, 2010, no pet.) (mem. op.) ("Texas courts have held that witness statements in a police officer's file do not qualify under the public-records exception set forth in Rule 803(8)"). Nonetheless, Appellants did not specifically indicate, either in the trial court or on appeal, which statements

14

they contend are inadmissible. As discussed *supra*, a general objection to evidence as a whole, which does not point out specifically the portion objected to, is properly overruled if any part of that evidence is admissible. *Lawrence*, 2009 WL 1886177, at \*5 (citing *Speier*, 616 S.W.2d at 619). Because much of the police report was admissible under the public record exception, and Appellants did not specifically indicate which portions of the report were not admissible, we conclude that the trial court did not abuse its discretion by overruling Appellants' objections to the police report. *See Speier*, 616 S.W.2d at 619; *Lawrence*, 2009 WL 1886177, at \*5; *see also Corrales*, 155 S.W.3d at 486.

We overrule Appellants' second issue.

### 3.    *Testimony Regarding L.M.'s Drug Use*

In their third issue, Appellants contend that the trial court erred by admitting testimony by Sergeant Gaskamp in which he repeated a statement made to him by L.M.'s sister. Sergeant Gaskamp testified that the sister had stopped him on the street and stated to him "that her brother [L.M.] has a bad drug problem and that he is no good for the child. Said that if he would take a blood test that he wouldn't pass it." Appellants objected that the testimony contained inadmissible hearsay. The trial court overruled the objection and allowed the testimony.

Even if the trial court abused its discretion in admitting the testimony, reversal is warranted "only if the error probably caused the rendition of an

15

improper judgment." *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *see* TEX. R. APP. P. 44.1(a)(1). "We review the entire record, and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted." *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). "Thus, if erroneously admitted or excluded evidence was crucial to a key issue, the error was likely harmful." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008).

The erroneous admission is harmless if the evidence is merely cumulative of evidence admitted elsewhere at trial. *Nissan Motor Co.*, 145 S.W.3d at 144. "Application of this rule requires an assessment of whether the subsequently admitted evidence is sufficiently similar to the objected-to evidence so as to render admission of the objected-to evidence harmless." *In re E.A.K.*, 192 S.W.3d 133, 148 (Tex. App.—Houston [14th Dist.] 2006, pet. denied.)

In this case, Sergeant Gaskamp's testimony regarding what L.M.'s sister had told him was cumulative of other evidence. In the crime victims' compensation application, Y.Y. stated that she had decided to report the recent assaults by L.M. "because I am scare[d] and I feel my children are in danger because [L.M.] drinks a lot and uses drugs." The application was admitted without objection by Appellants. The Department also offered Y.Y.'s written statement given to police. In the statement, Y.Y. reported that L.M. had used drugs in front of the children,

16

bought drugs with their food stamps, and forced her and the children to accompany him when he purchased drugs. Another of the Department's witnesses—an employee with the organization appointed as the children's guardian ad litem— testified that Y.Y. told her that L.M. used drugs.

In addition, Sergeant's Gaskamps's testimony repeating the sister's statement was not crucial to the central issue in this case. The Department's representative at trial testified that the Department had changed its goal from solely family reunification to non-relative adoption because of the domestic violence issues. The Department did not rely on L.M.'s drug use as a primary reason for the termination, and it was not emphasized by the Department at trial. Rather, the Department emphasized the long history of domestic violence, the negative effect it had on the children, Appellants' failure to acknowledge the domestic violence, and the likelihood that the abuse would continue because Appellants had reconciled.

Moreover, the evidence regarding the domestic abuse was disturbing and extensive, overshadowing the evidence related to L.M.'s drug use. Lastly, the effect of the testimony regarding the sister's statement that L.M. would fail a drug screen test was lessened by evidence at trial that L.M. had passed five drug screenings during the time that the children were in the Department custody.

Assuming that the admission of the testimony was in error, we conclude that Sergeant Gaskamp's testimony regarding the sister's statement probably did not cause the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1). Thus, we hold that any error in admitting the testimony was harmless.

We overrule Appellants' third issue.

### Sufficiency of the Evidence to Support Termination

In their fourth issue, Appellants assert that the evidence was legally and factually insufficient to support the termination of their parental rights to their three children.[5]

---

[5] The Department contends that Appellants failed to preserve their legal sufficiency challenge because they did not move for instructed verdict, move for judgment notwithstanding the verdict, object to the submission of a jury question, or move to disregard the jury's answer to a vital question. *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992). The Department asserts that Appellants did not preserve their factual sufficiency challenge because L.M. did not adequately raise his factual sufficiency challenge in his motion for new trial, and Y.Y. did not file a motion for new trial. *See* TEX. R. CIV. P. 324(b)(2); *Cecil v. Smith*, 804 S.W.2d 509, 510 (Tex. 1991). Each appellant did raise a sufficiency of the evidence challenge in his and her respective statement of appellate points filed in the trial court. Although not a motion, the statement of points arguably alerted the trial court that Appellants sought to challenge the sufficiency of the evidence to support the judgment of termination. *See Smith v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03–02–00598–CV, 2003 WL 22096141, at *6 (Tex. App.—Austin Sept. 11, 2003, no pet.) (mem. op.) (concluding that filing of statement of points adequate to preserve factual sufficiency challenge). Assuming without deciding that we may consider Appellants' sufficiency claims, we conclude, as discussed *infra*, that there was sufficient evidence to support termination in this case. *See Mason v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03–11–00205–CV, 2012 WL 1810620, at * 8, (Tex. App.—Austin May 17, 2012, no pet. h.) (mem. op.) (assuming without deciding that sufficiency challenge preserved and affirming termination order).

18

## A.    Burden of Proof and Standards of Review

The burden of proof at trial in parental-termination cases is by clear and convincing evidence.  TEX. FAM.CODE ANN. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).  Section 161.001 of the Family Code provides the method by which a court may involuntarily terminate the parent-child relationship.  *See* TEX. FAM. CODE. ANN. § 161.001.  Under this section, a court may order the termination of the parent-child relationship if the court finds, by clear and convincing evidence, that (1) one or more of the acts enumerated in section 161.001(1) was committed and (2) termination is in the best interest of the child.  *Id.*  "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

"'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE. ANN. § 101.007 (Vernon 2008); *J.F.C.*, 96 S.W.3d at 264.  This heightened burden of proof results in a heightened standard of review.

When determining legal sufficiency, we review all the evidence in the light most favorable to the finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96

19

S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id*. We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *Id*. This does not mean that we must disregard all evidence that does not support the finding. *Id*. The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id*. Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all of the evidence, not only that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id*. at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *Id*. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at

20

266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

The natural rights that exist between parents and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* at 20–21. However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26.

**B.      Sufficiency of Evidence to Support Predicate Findings Under 161.001(1)**

On appeal, Appellants do not specifically challenge each statutory predicate finding; rather, Appellants globally discuss why the evidence does not support termination.[6] The Department sought termination of Appellants' parental rights to their children based on the following three grounds for termination listed in section 161.001(1):

---

[6]      As briefed, we construe Appellants' sufficiency challenge to be a challenge only to the section 161.001(1) predicate findings supporting the judgment and not to the best interest determination. Appellants make no mention of the best interest finding in their brief.

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:

(1) that the parent has:

. . .

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

. . .

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;

. . . .

TEX. FAM. CODE ANN. § 161.001.

The charge instructed the jury that, for the parent-child relationship to be terminated between Appellants and their children, one of the events identified in subsections 161.001(D), (E), or (O) must by proven be clear and convincing evidence. For each parent, the jury was asked one question regarding termination: "Should the parent-child relationship between [parent] and the children, [I.M.],

[L.M., Jr.], and [T.M.], be terminated?"  The jury answered "yes" for each parent with respect to each child.

In its final order of termination, the trial court expressly rendered judgment on the jury's verdict, including a finding that each of the three section 161.001(1) predicates alleged by the Department had been proven.  This included findings that the acts of endangerment, described in subsections D and E, had been proven.

With regard to those findings, the trial court determined that L.M. and Y.Y. knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(1)(D).  The court also determined that each parent had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children.  *See id.* § 161.001(1)(E).

We begin by determining whether the evidence was legally and factually sufficient to support termination under the subsection E endangerment finding.

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health.  *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment."  *Tex. Dep't of Human Servs. v.*

23

*Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Rather, 'endanger' means to expose to loss or injury; to jeopardize." *Id*.

When determining whether the conduct of the parent has endangered the child's well-being under subsection E, we look exclusively to the parent's conduct, including actions, omissions, and failures to act. *Williams v. Williams*, 150 S.W.3d 436, 450 (Tex. App.—Austin 2004, pet. denied). Termination under subsection E must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent. *see Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being.").

"Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (holding that endangering conduct is not limited to actions directed toward child); *Jordan*, 325 S.W.3d at 723 (holding that danger to child need not be established as independent proposition and may be inferred from parental misconduct even if conduct is not directed at child and child suffers no actual

24

injury). Danger to the child's well-being may be inferred from parental misconduct alone, and courts may look at parental conduct both before and after the child's birth. *In re D.C.*, No. 01–11–00387–CV, 2012 WL 682289, at *9 (Tex. App.—Houston [1st Dist.] Mar. 1, 2012, pet. denied) (mem. op.); *see Boyd*, 727 S.W.2d at 534.

As a general rule, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re J.O.A.*, 283 S.W.3d at 345 n.4; *In re D.C.*, 2012 WL 682289, at *9; *see also Jordan*, 325 S.W.3d at 724 ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child."). Evidence of how a parent has treated another child or spouse is relevant to a determination of whether a course of conduct under section E has been established. *Jordan*, 325 S.W.3d at 724 (citing *In re D.T.*, 34 S.W.3d 625, 636–37 (Tex. App.—Fort Worth 2000, pet. denied)). Texas courts have determined that evidence of children's exposure to domestic violence is supportive of an endangerment finding. *L.B. v. Tex. Dep't of Family & Protective Servs.*, No. 03-09-00429-CV, 2010 WL 1404608, at *5 (Tex. App.— Austin Apr. 9, 2010, no pet.) (mem. op.); *see, e.g., In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (considering fact that mother "exposed her children to domestic violence," including incident where mother was "smacked" in front of child, as evidence of endangerment under subsection E); *In*

25

*re J.J.S.*, 272 S.W.3d 74, 79 (Tex. App.—Waco 2008, pet. denied) (upholding endangerment after trial court found that mother "conducted herself in a manner, namely her abusive relationships, which exposed her children to a home where physical violence was present"); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("Thus, the trial court could have considered the domestic violence . . . as evidence of endangerment to [the child].").

Here, the Department presented ample evidence that I.M. and L.M., Jr. were exposed to domestic violence while in the care of Y.Y. and L.M. The evidence showed that, in September 2009, Y.Y. had a broken arm. Y.Y. reported to hospital personnel, the police, and caseworkers with the Department that she received the broken arm while L.M. was hitting her in the head, and she raised her arm to defend herself. Y.Y. stated that her arm had been broken for two weeks, but L.M. had refused to allow her to seek medical care.

Y.Y. also reported that L.M. had sexually assaulted her while she had a broken arm. The evidence at trial showed that the sexual assault occurred in front of her children. L.M. reported that, at the time of the sexual assault, L.M. had told her that she was his property. Preceding the sexual assault, L.M. also threatened to kill their children if she did not have sex with him.

The Department also introduced photographs depicting the bruising on Y.Y.'s body. Y.Y. reported to the police that the bruising was caused by L.M.

26

The nurse, who performed Y.Y.'s sexual assault examination, testified that Y.Y. had bruising on her "upper arms where it looked like someone had put their thumb into her arms to hold her down approximately the size of a thumbprint." Sergeant Gaskamp testified that Y.Y.'s injuries were consistent with the assaults described by Y.Y.

The evidence also indicated that the domestic violence had been recurring. A number of the Department's witnesses testified that Y.Y. stated that L.M. had been abusing her for five years. Juanita Smith, a Department caseworker, testified that Y.Y. had stated that, when Y.Y. would threaten to leave him, L.M. would apologize and the abuse would stop for a few months, but then it would begin again.

Y.Y. also reported to a number of the Department's witnesses that L.M. had broken her nose in 2007 when the couple lived in California. This was confirmed not only by the Irvine, California police report but also by Y.Y.'s medical records from California and the California application for an emergency protective order admitted at trial.

The Department presented the testimony of the psychologist who had evaluated Y.Y. and L.M. in January 2010. He testified that he had concluded that Y.Y. had been physically and sexually abused. The psychologist testified that it is

very common for a victim to return to her abuser, explaining that it is a cycle of abuse.

As Appellants point out, Y.Y. recanted her abuse claims, and L.M. testified that the abuse allegations were false. Nonetheless, in termination cases, like elsewhere, it is within the sole province of the jury to weigh the credibility of witnesses. *See In re S.L.*, 188 S.W.3d 388, 394 (Tex. App.—Dallas 2006, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (stating fact finder "is the sole judge of the credibility of witnesses and the weight to be given to their testimony")). Thus, the jury was entitled to believe Y.Y.'s earlier claims of abuse and to disbelieve her later recantation.

The Department also presented evidence that living in a home with domestic violence is detrimental to a child's physical and emotional well-being. The evaluating psychologist testified that "tremendous" emotional damage may be done to a child living in a home with domestic violence. He stated that girls who witness such violence often grow up to seek out abusive men, and boys who witness domestic violence may grow up to be abusers. Such children are also at risk for depression and other psychological disorders. The psychologist further testified that the object of the domestic violence will often switch from the mother to the children.

28

The psychologist stated that L.M. had an antisocial personality, also known as a criminal personality.[7] Because of this personality, the psychologist was not optimistic that L.M.'s behavior would change, even with therapy. He noted that L.M. did not seem motivated to change. The Department also presented evidence that L.M. failed to complete the battering intervention prevention program as required by the service plan.

In addition, the Department presented the testimony of the licensed therapist who had counseled Y.Y. following the removal of the children. She testified that children, who live in a home with domestic violence, are at risk to be physically abused. The therapist also stated that such children are at risk for depression and eating and sleeping disorders. She testified that she counseled Y.Y. about the dangers to her children of staying in an abusive relationship. When Y.Y. began crying and stated that she loved L.M., the therapist told her that she needed to love her children more.

Juanita Smith also testified that she counseled Y.Y. about the risks to the children if she remained with L.M. Smith told Y.Y. that, because she could not protect herself from abuse, she could not protect her children from harm.

In their brief, Appellants cite evidence that they assert weighs against the termination findings. Appellants point out that Y.Y. is from Mexico and speaks

---

[7]    Although not emphasized by the Department, the evidence showed that L.M. had been convicted of several burglaries in the 10 year period before trial.

English as a second language. They contend that cultural and language barriers resulted in her making a false report against L.M. To refute this claim, the Department elicited testimony from numerous witnesses who indicated that Y.Y. appeared to understand English well and also spoke English well enough to communicate effectively with each witness.

Appellants also point out that two therapists, who had counseled L.M. during the months preceding trial, testified that L.M.'s behavior and attitude had improved. And Appellants point out that the record shows that Y.Y. had completed her service plan requirements. Appellants argue that they are being penalized for reconciling and for attempting to reunite their family.

Appellants are correct that evidence exists in the record that weighs against the termination findings. Nonetheless, evidence cannot be read in isolation; it must be read in the context of the entire record. It is undisputed that Y.Y. has chosen to return to L.M. The record contains evidence from which the jury could reasonably infer that L.M. has abused Y.Y. for years, he will continue to assault Y.Y., and Y.Y. will not be able to protect her children from being harmed physically, psychologically, and emotionally by the abuse. *See Jordan*, 325 S.W.3d at 724 ("Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future.").

Given the record, we conclude that the evidence, viewed in the light most favorable to the subsection 161.001(1)(E) finding, was sufficiently clear and convincing that a reasonable fact finder could have formed a firm belief or conviction that Appellants engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the section 161.001(1)(E) finding or was not so significant that the fact finder could not reasonably have formed a firm belief or conviction that the elements of subsection E were shown. Accordingly, we hold that the evidence was legally and factually sufficient to support the section 161.001(1)(E) finding as to each parent.[8]

We overrule Appellant's fourth issue.

---

[8] The same evidence that supports a finding of endangerment under subsection E also supports the trial court's finding under subsection D that Appellants' conduct subjected the children to "conditions or surroundings which endanger the physical or emotional well-being of the children." *See* TEX. FAM. CODE ANN. § 161.001(1)(D); *L.B. v. Tex. Dep't of Family & Protective Servs.*, No. 03-09-00429-CV, 2010 WL 1404608, at *5 n.13 (Tex. App.—Austin Apr. 9, 2010, no pet.) (mem. op.); *see also In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (explaining that "evidence pertaining to subsections D and E is interrelated"); *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of exposure to domestic violence and failure to complete service plan was sufficient to satisfy both subsections (D) and (E)). Having determined that the evidence was legally and factually sufficient to support termination based on subsections D and E, we need not determine whether the evidence was sufficient to support a finding under subsection O. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## Ineffective Assistance of Counsel

In their fifth issue, Appellants assert that they were not provided effective assistance of counsel at trial. Appellants list, in cursory fashion, nine alleged deficiencies with respect to counsels' trial performance. Appellants do not include any substantive analysis or discussion of the record in support of their contentions. *See* TEX. R. APP. P. 38.1(i) (requiring an appellant's brief to contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record). We conclude that Appellants have failed to properly brief their ineffective assistance of counsel claim; thus, it is waived. *See In re J.R.H.*, No. 11–09–00321–CV, 2010 WL 5093772, at \*3 (Tex. App.—Eastland Dec. 2, 2010, no pet.) (mem. op.) (holding, in termination of parental rights case, that issue waived because brief lacked adequate analysis and discussion of issue).

We overrule Appellants' fifth issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Higley, Sharp, and Huddle.